861 So.2d 644 (2003)
STATE of Louisiana
v.
Yalanis BROWN.
No. 03-KA-581.
Court of Appeal of Louisiana, Fifth Circuit.
November 12, 2003.
*646 Paul D. Connick, Jr., District Attorney, Thomas J. Butler, Terry M. Boudreaux, Assistant District Attorneys, Gretna, LA, for Appellee.
Bruce G. Whittaker, New Orleans, LA, for Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., MARION F. EDWARDS and WALTER J. ROTHSCHILD.
MARION F. EDWARDS, Judge.
Defendant appeals his conviction and sentence for possession of cocaine in excess of 400 grams, and his sentence for possession with intent to distribute marijuana. For the following reasons, the defendant's conviction and sentences are affirmed.
On October 20, 2000, the Jefferson Parish District Attorney filed a bill of information charging defendant, Yalanis Brown, with: Count 1, possession with intent to distribute marijuana in violation of LSA-R.S. 40:966(A), and Count 2, possession of cocaine in excess of 400 grams in violation of LSA-R.S. 40:967(F), both of which allegedly occurred on or about September *647 26, 2000. Brown was arraigned on November 30, 2000 and pled not guilty. On July 10, 11, 12, 13, and 16, 2001, the case was tried before a 12-person jury which unanimously found Brown guilty as charged. Brown's motion for new trial was denied on September 13, 2001.
On September 18, 2001, the trial court sentenced Brown to imprisonment at hard labor for 30 years on Count 1 and imprisonment at hard labor for 30 years without benefit of parole, probation, or suspension of sentence on Count 2, with the sentences to run concurrently. The trial court also ordered Brown to pay a fine of $250,000. On that same date, Brown orally moved for an appeal and filed a written motion for appeal that was granted.
At trial, the State introduced evidence to show that, in September of 2000, Jefferson Parish Sheriff's Office (JPSO) narcotics agents learned that a package containing a controlled dangerous substance was being shipped by United Parcel Service (UPS) from California to 321 Ruby Street, Apartment # 210, in Gretna, Louisiana, which is Brown's home address. After obtaining a search warrant, JPSO agents opened the package at the UPS station and found cocaine inside a VCR. On September 26, 2000, JPSO agents conducted a controlled delivery of that package to 321 Ruby Street using Deputy David Randell as the UPS delivery person.
Deputy Randell testified that when he arrived at the apartment complex, someone, later identified as Brown, was waiting for him. When Brown saw the UPS hat and the package, he asked Deputy Randell if he was the UPS man with a package to deliver. After Deputy Randell responded that he was, Brown led him upstairs to the apartment. When Brown opened up the door, he called to a man who was lying on the floor sleeping. Deputy Randell told that man that the package was here. The man got up, went to the door, and signed for the package.
As he was delivering the package, Deputy Randall had backup officers who were watching. After Deputy Randell left, he informed those officers that he had made the delivery. He gave them a description of the man who had signed for it and what he had seen inside the apartment. Deputy Randell described the man who signed for the package as heavy-set, weighing approximately 230 to 240 pounds. He identified the man who let him into the complex as smaller in stature, but taller in height, weighing approximately 160-170 pounds. He identified the man who signed the package in the courtroom; however, the record does not indicate the identity of that individual.
The testimony at trial revealed that, as the backup officers were about to knock on the door, they heard it opening. As Brown exited the residence, the officers "took him down" to the ground for their safety and detained him with handcuffs until they were able to see if anyone else was inside the residence. Sergeant Jason Renton stayed downstairs with Brown. The other agents went inside of the residence and detained the other individual. Sergeant Renton advised Brown of his Miranda rights, and defendant made a statement which Sergeant Renton recorded.
In his statement dated September 26, 2000, Brown stated that he was about to leave his residence that morning when officers came to his door and that he "dropped to the floor." Brown stated that a male, Darryan Washington, had come to his residence about an hour and a half before the UPS man came and before the agents got there. He did not know what time Washington arrived. He said that Washington had told him the UPS man was supposed to be coming and to look out for him. Brown said he told Washington he would *648 go outside because UPS would not be able to get into the gate.
Brown stated that, one day prior, Washington called and got his address and told him that UPS was going to deliver parts for his truck. Brown said that he did not know whether Washington had a house, that he did not know where Washington lived, that he did not have much affiliation with him, and that he had known Washington a long time. Brown said he thought it was strange that Washington was having something delivered to his home.
Brown stated that the UPS man asked him what his name was and told him he had a delivery in his name. Brown explained to the UPS man that the package was not for him but for his friend. Brown walked the UPS man up to his apartment and woke up Washington who was asleep on the floor. Washington got up and signed for the package. Once Washington signed for it, he asked Brown to bring him home. Brown said he told Washington that he thought he observed some "narcs" outside. Washington peeked out the window, and then he ran upstairs.
Brown realized that Washington was panicking, so he said he was going to leave because he did not want to get "caught up in it." When Brown opened the door, the agents rushed in and he got on the ground. Brown said he did not know what Washington had on him when he came to his apartment. He said that Washington did not go to his house the day before. Brown stated that Washington found out he had moved, and Brown was showing him his apartment.
Brown said he did not know whether Washington had anything in his hands when he came over because he did not pay attention. He said that when Washington got there Washington went upstairs. Brown said he did not know Washington was having drugs delivered to his apartment. Brown stated he knew nothing about the kilo of cocaine or the six ounces of crack cocaine found inside his residence in the upstairs bedroom, and that he had been in the apartment since Saturday, September 23.
Brown said he did not watch Washington when he came in so he did not know whether Washington had brought in the five pounds of marijuana found in his apartment. Brown said that the marijuana and cocaine found in his apartment were not his and he did not know anything. He said he was not holding it for anybody. Brown stated he probably would have noticed if Washington had carried a big gun into his apartment and maybe a small gun. He said Washington was too big to hide anything in his clothes.
Brown said he had a job at a barber shop, Get Fresh, where he cuts hair sometimes. He said the last job he had with a paycheck stub was at Avondale, where he worked for a few days about a year ago. He said he had "income tax," was doing a little side work, and got help from his mother and a girlfriend. Brown stated that he had saved money to get his furniture and "stuff." He said that he did odd jobs painting and that he got a "good bit" of money from a friend of his who did roofing work. Defendant explained that his DVD, digital CD player, big screen television, the stereo equipment, and the surround sound were gifts, that his living room set was "pretty cheap," and that all of those items only cost about $2,500.
Sergeant Renton testified that, on September 26, Brown had thousands of dollars worth of drugs and merchandise in his apartment, yet Brown admitted in his statement that he had not had a job where he received a paycheck in approximately a year prior to his arrest.
*649 After Sergeant Renton interviewed Brown, he listed the items that were removed from the residence on the return search warrant. Sergeant Renton explained that Agent Corey Wilson was upstairs where the majority of the search was being conducted, writing down what was found, where it was found, and who found it.
The JPSO agents who executed the previously prepared search warrant found the following items in Brown's second floor bathroom closet: a kilogram (1000 grams) of cocaine in the VCR; 29 individually packaged bags of crack cocaine (171.45 grams), a digital scale, and razor blades in a Crown Royal bag hanging on a hangar; 1,578.75 grams of marijuana in a large Rubbermaid container on the floor of the closet; plastic bags on the shelf in the closet; a .9 millimeter pistol; a magazine loaded with 12 rounds of ammunition; and an additional 16 rounds of .9 millimeter ammunition. The agents also recovered two clear plastic bags of cocaine (17.59 grams) in Brown's nightstand next to his bed. Brown stipulated that the marijuana was intended to be distributed.
Sergeant Vignes testified that he located a black leather jacket hanging inside Brown's closet about three or four items away from the Crown Royal bag, and that he had seen Brown wearing that jacket at a separate time. He searched the black leather jacket, which was a size large or extra-large, and found two bags containing a white rock-like substance later determined to be cocaine in the pockets.
Detective John Elton Scalen, Jr. testified that Washington told him he had lied to Brown about what was going to be in the package. Washington also told Detective Scalen that he told defendant auto parts were going to be in the package. Detective Scalen testified that the name on the package was "Tarra," a fictitious name. Sergeant Renton testified that the package containing the VCR was addressed to Trish Powell.
Agent William Metz testified that Washington told him on the way to the detective bureau that not only did Brown have nothing to do "with this," but that he had told Brown that he would be receiving a box of car parts. Washington told Agent Metz that he sells marijuana to Brown, that it was the first time he had received cocaine from the man in California, and that they used the VCR to ship narcotics and money back and forth. Agent Metz testified that Washington told him he owed $18,000 to the man in California, and that other than the kilo being delivered to Brown's apartment, there was no evidence that Brown was involved in that purchase.
Sergeant Renton testified that the wholesale value of the kilo of cocaine recovered from defendant's apartment was $20,000, and the street value was $100,000. He explained that the five pounds of marijuana found in Brown's apartment was worth $5,000, that the six ounces of crack cocaine was worth approximately $11,000, and that the other narcotics found were worth approximately $15,000 to $20,000. Sergeant Renton identified State's Exhibit 13 as 29 plastic bags containing crack cocaine. He testified that each bag was packaged for distribution, and that each bag was worth $50 to $200.[1] Sergeant Renton identified State's Exhibit 14 as another package of crack cocaine.
Sergeant Todd Vignes testified that he participated in the search of the apartment. He stated that he searched the left-hand *650 side of the closet where he found a Crown Royal bag that was hanging on a hangar. Inside that bag, he found 29 individually packaged bags of crack cocaine, approximately a quarter ounce each, razor blades and a digital scale. Sergeant Vignes testified that in his experience, those items were paraphernalia associated with the packaging and distribution of drugs. He explained that razor blades were used to cut the large brick of crack into quarter ounce sizes, and that the scale was used to weigh and verify the amount to be sold.
Sergeant Vignes testified that the value of the 29 bags of cocaine was approximately $300, but that if it was cut up into individual rocks, it could be sold for $20 apiece, or approximately $500 total. He explained that, based on his experience in the narcotics division, it was his opinion that the sandwich bags in the closet, not being close to the kitchen, coupled with the hand-held scale, indicated that it was packaging material and paraphernalia associated with the packaging and distribution of a controlled substance.
Sergeant Bruce Harrison was qualified as an expert in the use, packaging, distribution, and value of controlled dangerous substances. He testified that it would not be logical for a drug dealer to have a kilo of cocaine shipped across the country to an unknowing dupe's home and then to go to that home to pick up the shipment and bring an additional four pounds of marijuana, another 200 grams of cocaine, baggies, a scale, and a gun to that home. Sergeant Harrison explained that if he was a drug dealer and was using the unknowing dupe to receive a package containing drugs, he would not want to "dirty up" that location in the event that the package was being tracked. He said it would not make sense unless the dupe is not a dupe and he is involved with the kilo. On cross-examination, Sergeant Vignes testified that the 29 bags of cocaine indicated a situation involving a volume dealer who supplied the street level dealers.
The defense introduced evidence to show that Washington arranged to have the package containing the VCR and the kilogram of cocaine shipped to defendant's apartment, that the package was signed for by Washington, that all of the narcotics in defendant's apartment belonged to Washington and not to Brown, and that Brown knew nothing about the narcotics.
After hearing the evidence, the jury found defendant guilty as charged.
In his first assignment of error, Brown argues that the evidence was legally insufficient to support his conviction for possession of 400 or more grams of cocaine. He contends that: (1) the evidence showed he had nothing to do with the shipment or the receipt of the package containing the cocaine; (2) co-defendant Washington signed for and received the package; (3) Washington told the agents that defendant had nothing to do with the package, and that he had told Brown the package contained auto parts; (4) Agent Metz admitted that while the package was delivered to Brown's apartment, there was no evidence to suggest that the cocaine in the package was for Brown or that Brown knew of its existence; and (5) Brown was leaving the apartment as the agents entered, the cocaine never having been removed from the VCR or otherwise exposed. The State responds that the evidence was sufficient to support the conviction.
The standard for appellate review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable *651 doubt.[2] When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypotheses of innocence." The requirement of LSA-R.S. 15:438 does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.[3]
Brown was convicted of possession with intent to distribute marijuana in violation of LSA-R.S. 40:966(A) and possession of cocaine in excess of 400 grams in violation of LSA-R.S. 40:967(F). On appeal, Brown does not argue that the evidence was insufficient to convict him of possession with intent to distribute marijuana; in fact, he stipulated at trial that the marijuana was intended to be distributed. Rather, Brown argues on appeal that the evidence was insufficient to convict him of possession of cocaine in excess of 400 grams.
To support a conviction for possession of cocaine, the State must prove that the defendant was in possession of the cocaine and that he knowingly possessed it.[4] The State, however, need only establish constructive possession of a controlled dangerous substance, rather than actual possession, to support a conviction.[5] A person may be in constructive possession of a drug even though it is not in his physical custody, if it is subject to his dominion and control.[6]
Guilty knowledge is an essential element of the crime of possession of contraband, and such knowledge may be inferred from the circumstances.[7] Proximity to the drug, or association with the possessor, may establish a prima facie case of possession when colored by other evidence.[8] However, the mere presence of the defendant in the area where a controlled dangerous substance is found, or mere association with a person in possession of the substance, is insufficient to constitute constructive possession.[9]
Several factors may be considered in determining whether the defendant exercised dominion and control sufficient to constitute constructive possession. They are (1) the defendant's knowledge that illegal drugs were in the area; (2) his relations with the person found to be in actual possession; (3) the defendant's access to the area where the drugs were found; (4) evidence of recent drug use by the defendant; (5) the existence of paraphernalia; and (6) evidence that the area was frequented by drug users.[10]
*652 In State v. Ginorio,[11] defendant argued that the evidence was insufficient to prove that he possessed the cocaine seized from his residence. In Ginorio, several minutes before a search warrant was executed, defendant was seen arriving at his residence accompanied by Francisco Gomez, who was carrying a black plastic bag. The police found the black plastic bag wrapped in a towel under a mop, immediately outside the kitchen door, near the backyard of defendant's residence. Officer Jacques had arranged to purchase a large quantity of cocaine from Evelio Miranda approximately 20 feet from defendant's residence. A scale, similar to those used in drug trafficking, was found on the kitchen table. The court found that the evidence produced in the case, viewed in the light most favorable to the prosecution, revealed that any rational trier of fact could have concluded beyond a reasonable doubt that defendant was in constructive possession of the cocaine.
In reaching its conclusion the Ginorio court cited State v. Walker,[12] and stated:
In State v. Walker, 514 So.2d 602 (La. App. 4th Cir.1987), officers found, under the rear of the defendant's house, under a support beam, a plastic bag containing cocaine. Inside the house, the officers found evidence indicating drug trafficking, i.e. plastic bags, plastic bag seals, two amber colored bottles containing a white substance often used to cut cocaine, a .38 caliber revolver, and a scale. This court found that the items seized from the house indicated that the defendant exercised dominion and control over the premises where the cocaine was found and, considering these facts in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that the appellant was in constructive possession of the cocaine.[13]
In the instant case, the record reveals that the kilogram (1000 grams) of cocaine was found inside the VCR in the bathroom closet in the rear part of Brown's upstairs bedroom. Along with the kilogram of cocaine, the police found in that same closet 29 individually packaged bags of crack cocaine (171.45 grams), a digital scale, razor blades, plastic sandwich bags, 1578.75 grams of marijuana in a large Rubbermaid container, a .9 millimeter pistol, a magazine loaded with 12 rounds of ammunition, and an additional 16 rounds of .9 millimeter ammunition. The police also found cocaine in the drawer of Brown's nightstand next to his bed and in the pockets of a black leather jacket that fit Brown's physique hanging in his closet.
Based on the foregoing, we find that the State established that the cocaine was subject to Brown's dominion and control since it was found in his upstairs bathroom closet. Although Brown claimed in his statement he knew nothing about the drugs, his guilty knowledge could be inferred from the circumstances: Brown gave Washington his address so the package containing the cocaine could be shipped there; Brown's proximity to the cocaine (i.e. that it was found in his closet in his apartment); evidence indicative of drug trafficking was found in defendant's apartment, i.e., razor blades, plastic sandwich *653 bags, a digital scale, a gun, and ammunition; and defendant's admission in his statement that he tried to leave the scene after he saw "narcs" outside and observed Washington running around the apartment. Additionally, Sergeant Harrison testified that the circumstances did not indicate that Brown was duped.
The jury, faced with conflicting evidence, apparently found the testimony of the State witnesses to be more credible and rejected Brown's theory that the drugs did not belong to him and that he had no knowledge of them or how they got into his apartment. The credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. The credibility of witnesses will not be reweighed on appeal.[14]
Accordingly, based on a review of the record, we find that the State sufficiently proved beyond a reasonable doubt that the defendant was guilty of possession of cocaine in excess of 400 grams.
In his second assignment of error, Brown contends that the trial court improperly restricted his right to present a defense.
Specifically, Brown states that his defense was to show that the package of cocaine belonged to Washington and that in an effort to present that defense, Brown attempted to show that Washington was a fugitive from justice by eliciting testimony from Sergeant Renton. However, the trial court refused to allow the testimony in question. Brown contends that the trial court erred in failing to allow him to elicit this testimony.
As the State correctly points out in its brief, Brown failed to lodge a contemporaneous objection to the court's ruling on this issue. Therefore, we find that Brown defendant is precluded from raising this issue on appeal.[15] The purpose of the contemporaneous objection rule is to put the trial judge on notice of the alleged irregularity so that he may cure the problem and to prevent the defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection.[16]
In his last assignment of error, Brown argues that his two 30-year concurrent sentences, the maximum terms of imprisonment available, are constitutionally excessive because he is 25 years old, a first offender, and the crimes were non-violent. The State responds that the sentences were not excessive, and that the trial judge did not abuse his discretion.
Brown did not file a motion for reconsideration of sentence, nor did he orally object to the sentence after it was imposed.[17] The failure to file a motion to reconsider sentence, or to state specific grounds upon which the motion is based, limits a defendant to a bare review of the sentence for constitutional excessiveness.[18]
The Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. A sentence is considered excessive if it is grossly disproportionate to the offense *654 or imposes needless and purposeless pain and suffering.[19] A reviewing court will not set aside a sentence as excessive if the record supports the sentence imposed.[20] Factors the court may consider in reviewing the sentencing judge's discretion are: 1) the nature of the crime, 2) the nature and background of the offender, and 3) the sentence imposed for similar crimes by the same court and other courts.[21]
Prior criminal activity is one of the factors to be considered by the trial judge in sentencing a defendant. Prior criminal activity is not limited to convictions.[22]
In the instant case, on September 18, 2001, at the sentencing hearing, defense counsel stated that Brown had one conviction as a juvenile, and that the other conviction was the matter he had pled guilty to after he was found guilty in this case. Prior to sentencing, the trial judge stated:
The Court has had an opportunity to review the pre-sentence investigation report.[23] Also, this case was tried in this division for a few days. I had an opportunity to hear all of the facts involved. I've considered the guidelines under 894.1. I've taken into account your criminal history, your family history, the facts of the case, and whether a lesser sentence would deprecate the seriousness of this offense.
The trial judge subsequently sentenced Brown on Count 1 (marijuana conviction) to imprisonment at hard labor for 30 years and on Count 2 (cocaine conviction) to imprisonment at hard labor for 30 years without benefit of parole, probation, or suspension of sentence, with the sentences to run concurrently. The trial judge also ordered Brown to pay a fine of $250,000 in connection with Count 2. As such, the trial judge sentenced Brown to the maximum sentence for possession with intent to distribute marijuana and the mandatory minimum sentence for possession of over 400 grams of cocaine.
Brown was convicted of Count 1, possession with intent to distribute marijuana in violation of LSA-R.S. 40:966(A). The trial judge sentenced defendant to 30 years of imprisonment at hard labor.
At the time the crime was committed (September 26, 2000), LSA-R.S. 40:966(B)(2) (footnote added) provided as follows:
Any other controlled dangerous substance classified in Schedule I,[24] shall *655 upon conviction be sentenced to a term of imprisonment at hard labor for not less than five years nor more than thirty years and pay a fine of not more than fifty thousand dollars.
LSA-R.S. 40:966(B)(2) was amended by Acts 2001, No. 403 § 4, effective June 15, 2001, to require that at least five years of the sentence shall be served without benefit of parole, probation, or suspension of sentence. The provision regarding the fine remained the same. The provision of the act only had prospective effect.
In the instant case, Brown committed the crime prior to the effective date of the statute, September 26, 2000; however, he was sentenced after the effective date of the statute (September 18, 2001). The supreme court was faced with a similar situation in State v. Sugasti,[25] In Sugasti, the supreme court held that those who engage in criminal activity must face the consequences of their actions, including the penalty provisions that apply as of the date of the offense.[26]
After a review of the record, we find that the maximum sentence of 30 years at hard labor on the possession with intent to distribute marijuana conviction was not excessive. The record shows that the trial judge reviewed the PSI; heard the facts of the case at trial; considered the guidelines of LSA-C.Cr.P. art. 894.1; took into account Brown's criminal history and family history; and considered whether a lesser sentence would deprecate the seriousness of this offense. The record reflects that defendant was in possession of a large amount of marijuana at the time of his arrest. Additionally, the PSI indicates that Brown has a prior record of drug arrests, and that he was convicted of another drug possession offense on August 1, 2001. In light of the foregoing, we find that the trial court did not abuse its sentencing discretion, and that Brown's sentence on the marijuana conviction was not constitutionally excessive.
Brown was also convicted of Count 2, possession of cocaine in excess of 400 grams in violation of LSA-R.S. 40:967(F). The trial judge sentenced Brown to imprisonment at hard labor for 30 years without benefit of parole, probation, or suspension of sentence, with the sentence to run concurrently with the 30-year sentence on the marijuana conviction. The trial judge also ordered Brown to pay a fine of $250,000 in connection with Count 2.
At the time the crime was committed (September 26, 2000), LSA-R.S. 40:967(F)(1)(c) provided as follows:
Any person who knowingly or intentionally possesses four hundred grams or more of cocaine or of a mixture or substance containing a detectable amount of cocaine or of its analogues as provided in Schedule II(A)(4) of R.S. 40:964, shall be sentenced to serve a term of imprisonment at hard labor of not less than thirty years, nor more than sixty years and to pay a fine of not less than two hundred fifty thousand dollars, nor more than six hundred thousand dollars.
LSA-R.S. 40:967(F)(1)(c) was amended by Acts 2001, No. 403 § 4, effective June 15, 2001, to change the term of the sentence from "not less than thirty years, nor more than sixty years" to "not less than fifteen years, nor more than thirty years." The provision regarding the fine remained the same. The provision of the act only had prospective effect. The statute in effect at the time the crime was committed *656 is applicable.[27] As such, the trial judge sentenced Brown to the mandatory minimum sentence for possession of over 400 grams of cocaine.
A mandatory minimum sentence is presumed to be constitutional. The burden is on the defendant to rebut the presumption of constitutionality by showing that he is exceptional. He must show he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.[28] It is not the role of the sentencing court to question the wisdom of the legislature in setting mandatory minimum punishments for criminal offenses. Rather, "the sentencing court is only allowed to determine whether the particular offender before it has proven that the mandatory minimum sentence is so excessive in his case that it violates our constitution."[29]
In State v. Esteen,[30] defendant was convicted of two counts of possession of cocaine over 400 grams and sentenced to 50 years at hard labor on each count. He was convicted of conspiracy to possess cocaine over 400 grams and sentenced to 25 years at hard labor. He was also convicted of attempted possession of cocaine over 400 grams and sentenced to 25 years at hard labor. All sentences were ordered to run consecutively for a total of 150 years. This Court found that the sentences were constitutional, noting that the sentences were within statutory limits, that defendant was a serious drug dealer, and that defendant failed to present any mitigating circumstances to warrant lesser sentences.
In the instant case, we find that the 30-year mandatory minimum sentence of 30 years is not excessive. Brown has failed to show that his sentence is unconstitutionally excessive as it applies to him. Brown has further made no showing that he is exceptional, justifying a downward deviation from the imposition of the mandatory minimum sentence. The record shows that Brown was convicted of possession of 1000 grams of cocaine, much more than the amount of cocaine required by the statute to trigger the 30-year minimum penalty. Additionally, as was stated previously, the trial judge reviewed all the pertinent information, including the PSI which indicates that defendant has a prior record of drug arrests, and that he was convicted of another possession of cocaine offense on August 1, 2001. Based upon the facts of this case, we find that the sentence imposed is not excessive and is suitably tailored to both the offender and the offense.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[31] and State v. Weiland.[32] The review reveals errors patent in this case.
We note that the trial judge failed to impose the mandatory fine of "not more than fifty thousand dollars."[33]
LSA-C.Cr.P. art. 882(A) provides that "[a]n illegal sentence may be corrected at any time by the court that imposed the *657 sentence or by an appellate court on review." State v. Williams[34] provides that an appellate court may recognize and correct an illegally lenient sentence under the authority of LSA-R.S. 15:301.1(A) and LSA-C.Cr.P. art. 882 as follows:
In the present case, the authority of the appellate court to recognize sentencing error arises in part from the self-activating provisions of LA.REV.STAT. ANN. § 15:301.1(A) (i.e., the failure to impose sentence without benefit of parole, probation, or suspension of sentence) and under the general provisions of LA. CODE CRIM. PROC. ANN. art. 882 (the sentencing errors other than those which fall under LA.REV.STAT. ANN. § 15:301.1(A)). Under the provisions of article 882, "[a]n illegal sentence may be corrected at any time by ... an appellate court on review." ... Accordingly, the appellate court on its own properly noticed the numerous sentencing errors in the punishment that the sentencing court imposed without the need to concern itself with the time limitations of Paragraph B.
More specifically, the Williams court addressed the issue of the authority and appropriateness of correction of an illegally lenient sentence in that the trial court failed to impose a mandatory fine of $2000.00. In Williams neither the sentencing court nor the district attorney sought to amend the sentence.
The appellate court has the authority under LSA-C.Cr.P. art. 882 to recognize and to correct the sentence "at any time."[35] We note, however, that the language of article 882 is permissive rather than mandatory. In this case we will not correct the illegally lenient sentence.
For the foregoing reasons, the defendant's conviction and sentences are affirmed.
AFFIRMED.
NOTES
[1] The Exhibit Index indicates that State's Exhibit 13 also contained one digital scale, razor blades, and one Crown Royal bag.
[2] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
[3] State v. Guccione, 96-1049 (La.App. 5 Cir. 4/29/97), 694 So.2d 1060, 1067, writs denied, 97-2151 (La.3/13/98), 712 So.2d 869 and 01-2825 (La.8/16/02), 822 So.2d 613.
[4] State v. Ruffin, 96-226 (La.App. 5 Cir. 8/28/96), 680 So.2d 85, 87.
[5] Id.
[6] Id.
[7] State v. Gentras, 98-1095 (La.App. 5 Cir. 3/30/99), 733 So.2d 113, 117, writ denied, 99-1302 (La.10/15/99), 748 So.2d 464.
[8] State v. Johnson, 404 So.2d 239, 245 (La. 1981), cert. denied, 456 U.S. 925, 102 S.Ct. 1970, 72 L.Ed.2d 440 (1982).
[9] State v. Cann, 319 So.2d 396, 397 (La.1975).
[10] State v. Williams, 98-1006 (La.App. 5 Cir. 3/30/99), 735 So.2d 62, 69, writ denied, 99-1077 (La.9/24/99), 747 So.2d 1118, citing State v. Appacrombie, 616 So.2d 285, 288 (La. App. 2 Cir.1993), writ denied, 623 So.2d 1302 (La.1993).
[11] 619 So.2d 790, 794-795 (La.App. 4 Cir. 1993), writ denied, 625 So.2d 1039 (La.),
[12] 514 So.2d 602 (La.App. 4 Cir.1987)
[13] State v. Ginorio, 619 So.2d at 795. It is noted that, when the search warrant was executed, defendant and others were found outside the residence and other persons were found inside the residence. State v. Walker, 514 So.2d at 604.
[14] State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
[15] LSA-C.Cr.P. art. 841.
[16] State v. Thomas, 427 So.2d 428, 433 (La. 1982); State v. Harris, 02-397, p. 25 (La.App. 5 Cir. 9/30/02), 829 So.2d 530, 539.
[17] LSA-C.Cr.P. art. 881.1.
[18] State v. Pendelton, 00-1211 (La.App. 5 Cir. 3/14/01), 783 So.2d 459, 465, writ denied, 01-1242 (La.1/25/02), 807 So.2d 243.
[19] State v. Lobato, 603 So.2d 739, 751 (La. 1992).
[20] LSA-C.Cr.P. art. 881.4(D); State v. McCorkle, 97-966 (La.App. 5 Cir. 2/25/98), 708 So.2d 1212, 1219.
[21] State v. Ulmer, 99-1079 (La.App. 5 Cir. 1/25/00), 751 So.2d 1017, 1019.
[22] State v. Alexander, 98-993 (La.App. 5 Cir. 3/10/99), 734 So.2d 43, 47, writ denied, 99-2138 (La.12/10/99), 751 So.2d 250 (citing State v. Washington, 414 So.2d 313, 315 (La. 1982)).
[23] The PSI indicates that defendant had a juvenile record: that in 1990 he was arrested and charged with possession with intent to distribute cocaine; that he was placed on probation until 1996; that his probation was terminated in 1992 unsuccessfully; that in 1992 he was arrested for simple battery; and that the simple battery charge was dismissed. The PSI further indicates that defendant had an adult record: that he was arrested in 1996 and in 1998 for possession with intent to distribute crack, and that he was arrested on July 7, 2000 for possession of cocaine and sentenced to three years at hard labor on August 1, 2001. No statement was taken from defendant, and no recommendation was made in the PSI.
[24] Marijuana is classified in this category. LSA-R.S. 40:964(C)(22).
[25] 01-3407 (La.6/21/02), 820 So.2d 518.
[26] Id. at 522.
[27] State v. Sugasti, 01-3407 (La.6/21/02), 820 So.2d 518, 522.
[28] State v. Johnson, 97-1906, p. 8 (La.3/4/98), 709 So.2d 672, 676.
[29] State v. Johnson, supra.
[30] 01-879 (La.App. 5 Cir. 5/15/02), 821 So.2d 60, writ denied, 02-1540 (La.12/13/02), 831 So.2d 983
[31] 312 So.2d 337 (La.1975).
[32] 556 So.2d 175 (La.App. 5 Cir.1990).
[33] LSA-R.S. 40:966(B)(2).
[34] 00-1725 (La.11/28/01), 800 So.2d 790.
[35] Williams, supra, 800 So.2d at 802.